WELLS–GRINNAN M.A.B. et al.,
Appellants,

v.

BELTON SAND AND GRAVEL CO., Inc.,
et al.,
Appellees.

No. 10406.

Court of Civil Appeals of Texas.

Austin.

June 13, 1956.

Rehearing Denied Aug. 8, 1956.

Owens, Purser & Stevenson, Austin, Scurry, Scurry & Pace, Dallas, for appellants.

O. D. Montgomery, Callaway, Reed, Kidwell & Brooks, Dallas, for appellees Belton

Sand & Gravel Co., Inc. and Stanley C. Morris and wife Dorothy Morris.

Moursund, Ball, Bergstrom & Barrow, San Antonio, for appellee, San Antonio Portland Cement Co.

HUGHES, Justice.

Before proceeding to the merits of this cause we will briefly explain our prior action herein in overruling two motions filed by appellee San Antonio Portland Cement Company.

A motion was made to strike the statement of facts filed herein because it was not submitted to appellee or its attorneys for examination or approval and was not examined or approved and, in fact, its completion was not known until notice of its filing by the Clerk of this Court was received by appellee's counsel.

Before the statement of facts was filed in this Court on January 12, 1955, we had granted an extension of time, agreed to by all parties, for filing the record here.

The statement of facts which is labeled "Hearing on Pleas of Intervention" was approved by counsel for Wells-Grinnan M.A.B. and counsel for appellant W. S. Conner. It was certified to by C. E. Bishop, Official Court Reporter for the District Court of Bell County as a full and correct transcript of the proceedings except as to certain exhibits omitted by agreement of counsel and "Examined, Approved and Ordered filed" by the Judge of the Trial Court.

Rule 377, Texas Rules of Civil Procedure, upon which appellee relies, has been construed by the El Paso Court in Sparks v. Chandler, Tex.Civ.App., 201 S.W.2d 252, and by the Galveston Court in Newsom v. Boyd, Tex.Civ.App., 203 S.W.2d 874, under circumstances similar to those found here as not requiring, under the penalty of being stricken, that the statement of facts be submitted to or approved by opposing counsel. We agree with and follow those cases.

■ The other motion of Portland was to dismiss the appeal grounded upon the failure of Wells-Grinnan M.A.B. and W. S. Conner to give, and the transcript to disclose, notice of appeal from the judgment rendered in the severed cause involving the intervention of Portland and others.

The original transcript filed in this cause did not contain notice by the named appellants. Following the filing of the original motion to dismiss this appeal on the ground stated appellants were granted leave to file a supplemental transcript. This transcript, 105 pages, shows that on February 3, 1956, appellants Wells-Grinnan and Conner filed a motion before the Trial Judge to correct the judgment, nunc pro tunc, so as to insert proper notice of appeal which it was alleged had been timely given. After an extended hearing the court granted the motion from which order we quote:

"* * * it appearing to the court, and being hereby found by the court that following the trial of this cause on June 6th and 7th, 1955 the court took this cause under advisement, and on July 11, 1955 advised all parties that he was rendering judgment as set forth in his letter of July 11, 1955 addressed to all attorneys of record in this cause; that on July 13, 1955 Mr. O. D. Montgomery prepared and furnished to all parties a draft of the judgment to be entered in said cause; that on the latter part of July, 1955, R. G. Scurry, representing plaintiff, and Sidney Purser, representing defendant W. S. Conner, appeared in open court, gave notice of appeal from the judgment rendered by the court, and requested the court to enter such notice of appeal in the judgment to be entered; that such judgment was not entered until August 29, 1955, and on such date the court filed and entered the judgment in this cause, and through mistake, failed to enter in said judgment the notice of appeal theretofore given in open court by the plaintiff and defendant, and failed to enter on the docket sheet in this cause that judgment was rendered, exception taken thereto, and notice of appeal duly given in open court; that such inadvertence was not discovered until the latter part of January, 1956, when counsel for plaintiff, Wells-Grinnan-M.A.B., and defendant, W. S. Conner, began the preparation of briefs to be filed in the Court of Civil Appeals. The court further finds that such notice of appeal was given in open court within the time required by law, and the failure to enter such notice of appeal in the minutes of the court or on the docket sheet was a clerical mistake and should be corrected."

It is our opinion that the factual finding of the court that notice of appeal was given in open court is conclusive here.

The merits of this appeal arise from a breach of contract suit filed by Wells-Grinnan M.A.B., appellant, against W. S. Conner, also an appellant, the contracts involved relating to concrete work on the Military Housing Project at Fort Hood, Texas, known as Walker Village. Wells-Grinnan M.A.B. were the general contractors for the project. Conner was a subcontractor who had contracted to furnish all materials and labor for certain concrete work required by the general contract. Conner also sublet some or perhaps all of his obligations as subcontractor to Wayte and Colwell and B. W. C. Construction Company and, in the main suit, he impleaded them and the sureties on their performance bonds.

Interventions were filed in this suit by appellees San Antonio Portland Cement Company, Belton Sand and Gravel Co. Inc. and Stanley C. Morris and wife, Dorothy Morris (Neelley Ready-Mix) and by M. E. "Buck" Braddock (Abilene Concrete Company) in which claims were asserted for material furnished for and used in construction of Walker Village.

These interventions were severed from the main cause and it is from the judgment rendered in this severed cause that this appeal was taken.

The judgment, rendered after a nonjury trial, insofar as concerns this appeal decreed:

(1) That San Antonio Portland Cement Company recover of and from appellants $5,228.92 plus $602.42 accrued interest plus 6% interest on the judgment.

(2) That Belton Sand and Gravel Company recover judgment of and from appellants $3,568.75 plus $440.26 accrued interest plus 6% interest on the judgment.

(3) That Stanley C. Morris and wife recover of and from appellant Wells-Grinnan M.A.B. $8,859.98 plus $812.16 accrued interest plus 6% interest on the judgment.

There are no findings of fact.

The Cement Company has filed one brief and the other appellees a separate brief but appellants have filed a single brief containing three points which make no distinction between the parties hence we will dispose of these points as presented.

The first point is that the Trial Court erred in rendering judgment against them for the reason that any promise made by either of them to pay appellees for materials furnished by them to the B. W. C. Construction Company is within the Statute of Frauds, Vernon's Ann.Civ.St. art. 3995.

All appellees deny that this question is before the court and they disclaim any effort to plead or prove a promise on the part of Conner to pay any account which the B. W. C. Construction Company owed appellees.

The Cement Company denied that it had any account with B. W. C. It pleaded that its contract was made with Conner and on his credit and that pursuant to such contract deliveries were made to Braddock (Abilene Concrete Company).

Belton Sand and Gravel makes a similar claim against Conner.

As to Wells-Grinnan M.A.B. all appellees base their claim of liability upon a written agreement between Wells-Grinnan M.A.B. and Conner and this feature of the case will be noticed later.

We must examine the evidence to determine whether the Statute of Frauds is applicable to the undertaking of Conner.

Appellants have digested the evidence upon which they rely to show the nature of the agreement made by Conner as follows:

"Mr. Rhodes, witness in behalf of Belton Sand and Gravel Company, Inc., testified that W. S. Conner said at one time that he would pay 'that account' (in reference to B. W. C.'s account with Belton Sand and Gravel Company, Inc.) and would withhold it from the estimate of B. W. C. up to that time and would pay 'their account in full'. This same witness testified that the substance of his conversations with Conner was that 'he (Conner) would do everything in his power to see that we got our money for the materials that had been used on the job.' On cross-examination this witness stated as follows:

" 'Q. Now, the way I have interpreted what you said here is that Mr. Conner said he would withhold this money out of Mr. Wayte's, or out of the B. W. C. Construction Company's, estimate and would pay it directly to you, and that Mr. Wayte consented to that, is that correct? A. Yes, sir.'

"The other witness, in reference to his claim, was Elmer H. Hayes, who testified that W. S. Conner told him that if they would send him a copy of the invoices, that he (Conner) 'Would see that we were taken care of.'

"The witness, H. T. Brewster, who testified in reference to the claim of

San Antonio Portland Cement Company, stated that Conner told him that he (Conner) would 'see that we got our money'. He also testified that Conner told him that he 'would try to hold it out of the estimates and get your check for you'.

"Appellant, W. S. Conner, testified that he did not at any time ever promise to do anything except help the Appellees get their money and that he would hold the amount of their accounts out of estimates of B. W. C. Construction Company as they became due if agreeable with B. W. C. Construction Company.

"It is uncontradicted that W. S. Conner did, with the consent of B. W. C. Construction Company, hold sums due Appellees out of B. W. C. Construction Company's estimates then due. On January 31, 1953, Neeley Ready-Mix Concrete Corporation wrote W. S. Conner a letter notifying him of the balance due on their account with B. W. C. Construction Company. On February 6, 1953, Belton Sand and Gravel Co. Inc. wrote W. S. Conner a letter notifying him of the balance due on their account with Abilene Concrete Company. The witness Brewster testified that Conner did do exactly what he had agreed to do until the last estimate.

"It is further undisputed that W. S. Conner did not at any time after receiving these letters, or notice of the present claim of San Antonio Portland Cement Company, pay any estimate whatsoever to B. W. C. Construction Company."

We assume that appellants believe this testimony to be their most favorable testimony to be found in the 365 page statement of facts. Appellants make no apparent effort to analyze all the testimony and do not reply to appellees' summary thereof.

Mr. H. T. Brewster, an employee of the Cement Company, testified that he had conversations with Conner at Walker Village and at Conner's office, but did not recall the exact date, as follows:

"Q. What was said by you and what was said by him? A. I told him that we could ship cement on that job and he said all right, and asked me to bill it to the Abilene Concrete Company.

"Q. And what did you say to that? A. Well, I did not say anything at that time, Judge. I called in the order and my company refused to ship to the Abilene Concrete Company because they said their credit was bad and they would not ship to them.

"Q. When did you next see Mr. Conner? A. Well, in the next few days I saw Mr. Conner in his office and I told him that we could not invoice the Abilene Concrete Company, that the company would not let me.

"Q. What did he say? A. He said that he would see that we got our money, that if we shipped it that he would see that it was held out of the estimates."

Brewster reported the latter conversation to his Company. Brewster further testified:

"Q. Did you talk to him (Conner) at any time about the bills not being paid? A. Yes, sir.

"Q. When was that? A. That was when the invoices were not paid and they sent me a copy to Austin and then I went to see Mr. Conner and they were paid after that until the last part of the job when it was stopped."

Buck Braddock, owner of Abilene Concrete Company, testified:

"Q. And did he (Conner) later on tell you that you could order cement

from the San Antonio Portland Cement Company? A. Yes, he did.

"Q. He did? A. Yes, sir.

"Q. And that is what you went on when you started ordering? A. Yes, sir."

Buck Braddock had no dealings with the Cement Company other than to order cement by telephone and inquire over the telephone how the account stood. The cement was charged on the ledger to Abilene Concrete Company and when the check the company gave July 17th was returned unpaid, the matter was taken up with Mr. Conner and resulted in his making payment to the Cement Company of $3,172.50 on August 20th to cover the amount of said check and another invoice. The payment was by check of Mr. Conner, payable to B. W. C. Construction Company and San Antonio Portland Cement Company and endorsed by B. W. C. Construction Company and sent in by Mr. Conner and Mr. Conner asked that copies of invoices and receipted bills be mailed to him. He made two additional payments to the Cement Company by his checks, payable to it, one dated September 18, 1952 for $896.25 and the other dated October 23, 1952 for $1,606.25. On September 19, 1952, the Cement Company received memorandum written by Conner and which evidently accompanied the September 18th check for $896.25 in which he stated "this check does not cover the last car shipped in August. This car received in September. P. S. Please mail copies of receipted billing to me at Austin. Thanks." Such check bears the notation "apply to account Abilene Concrete Company shipped to Killeen, Texas—2 cars less credits." The amount of such check is accounted for by reason of credits taken by Conner for sacks returned and the same is true of the October 23rd check. These credits are shown on ledger account of San Antonio Portland Cement Company and such last payment covered the transactions down to the shipment of October 21, 1952 as shown

on said ledger account. No further payments were made, leaving unpaid an item in the sum of $1,070, two additional items in the same amounts, November 3rd and November 13th and other items incurred in December and January, the final amount after deducting credits for sacks returned being $5,463.25.

It is evident that Conner kept in close touch with the shipments made by the Cement Company and with the credits to which the account became entitled by reason of return of cloth sacks. He approved such balance, adding one cent, when he had it inserted in the March 17th Letter Agreement later noticed.

Conner paid Belton Sand and Gravel Company an October account on December 17, 1952 but did not pay the Cement Company for its October shipment, or any subsequent shipments. He admitted paying estimates to B. W. C. Construction Company each month except January, during which month he made certain advancements to pay labor costs.

Buck Braddock testified that he had failed to get a promised payment for August and had failed the month before to get a promised payment. About August 15th, at a time when Braddock's account against B. W. C. Construction Company was $23,150.65 he had a conversation with Mr. Conner and Mr. Wayte in which he stated that he did not want to be responsible for any more materials delivered to him, that he was not getting his money as he should; that at that time Conner was owing B. W. C. Construction Company quite a bit of money and they were owing Braddock quite a bit of money and that he, Braddock, had not paid for anything and Conner and Wayte asked him if he would continue to furnish the equipment and labor if they would look out after the materials and Braddock told them he would try to get through with it; that both said they would look out for the payments of the materials and relieve him of that responsibility.

Braddock continued to deliver concrete month after month, to B. W. C. Construction Company as shown by his recovery herein until the work was rejected and the Company quit, his final account being $35,826.72.

█ When we consider the above evidence along with Conner's contractual obligation to furnish the materials supplied by the Cement Company and Conner's financial interest in the performance of his contract and of the contracts of his subcontractors we have no difficulty in sustaining the implied finding of the Trial Court that Conner pledged his own credit for the purchase of such materials and thereby made himself primarily liable for their payment.

█ The law involved is simple and not controversial. If Conner agreed to pay the debt of another the Statute of Frauds is involved; if the materials were furnished upon Conner's credit the Statute is not involved. Moutos v. San Saba Peanut Growers' Ass'n, Tex.Civ.App.Austin, 268 S.W.2d 761; Shahan-Taylor Co. v. Foremost Dairies, Tex.Civ.App.San Antonio, 233 S.W.2d 885; writ ref. N.R.E., Hacker v. Whitney Dam Lumber & Construction Company, Tex.Civ.App.Waco, 225 S.W.2d 225, writ ref., Liebman v. Buell Lumber & Mfg. Co., Tex.Civ.App.El Paso, 67 S.W.2d 1043; Pool v. Sanford, 52 Tex. 621.

The evidence relied upon by appellant, all of which we have set out, is not conclusive, under all the evidence, and, at most, merely raised fact issues settled adversely to him by the Trial Court.

Passing now to a consideration of the evidence relied upon by Belton Sand and Gravel Company to sustain the primary liability of Conner to it we find:

The Belton Sand and Gravel Co., Inc. contract was originally with M. E. (Buck) Braddock, d/b/a Abilene Concrete Company to furnish him sand and gravel for the flat work job which was to be per-

formed by B. W. C. under the latter's subcontract with appellant Conner.

Braddock paid for materials furnished by Belton Sand and Gravel for a while and then payment was attempted by checks returned unpaid. When this occurred the President, Elmer H. Hays, and Assistant Manager, W. Bass Rhodes, of Belton went to see Wells-Grinnan M.A.B. and arrangements were made whereby back bills were paid by Mr. Conner and B. W. C. agreed to pay future invoices sent to it if Braddock had insufficient funds. Subsequent invoices were not paid by B. W. C. or Braddock and Mr. Rhodes testified as follows:

"A. The next conversation with Mr. Conner regarding their delinquent account, and me informing him that it would be necessary for me to stop sending material, was held I believe, around, sometime around the first of October, sometime during the month of October of 1952.

"Q. And that was subsequent to the time that you had received any check made jointly to BWC Construction Company by Mr. Conner? A. Yes, sir.

"Q. State whether or not any agreement was made at that time as to how the account would subsequently be handled? A. At that time I informed Mr. Conner and Mr. Wayte, both of which were present, that unless I received payment on past due accounts for sand and gravel materials, that I was going to discontinue sending sand and gravel materials to the project until such time as I had received payment. Mr. Conner informed me that not to receive the sand and gravel for the project would halt the work on the project, and that if I would send him a copy of the invoices and if it was all right with Mr. Wayte, that he would pay me for the materials in order that I would continue to ship materials to

the project, and he did pay the invoices for September and October of 1952.

"Mr. Myer: Who is he? A. Mr. W. S. Conner by a check for $1,742.75 that was received on December 17, 1952, which paid the account in full through October with the exception of $84.00 of discount that he took that was not entitled to be taken.

"Q. That was his personal check, as I understand it? A. It was signed by him personally. I don't recall whether it was W. S. Conner Construction Company or W. S. Conner, but it was signed by Mr. Conner, and as I recall it, was given to me personally.

"Q. Now, the last item of your materials was furnished when? A. On the 27th day of January, 1953, it was either the 26th or the 27th day. I just wouldn't be positive but it was right at the last of January.

"Q. Did you have any conversation with Mr. Conners subsequent to that date? A. I talked to Mr. Conner a number of times, yes, sir.

"Q. What was the earliest time you remember? A. Well, I am sure that I talked with him after the 30th of November, soon after that, when the next payment was due that was not paid.

"Q. What was the substance of that conversation? A. The substance of the conversation was that he could not at that time pay the invoice, but that he hoped that he would soon be able to do so.

"Q. As subsequent invoices arose did you have further conversation with him? A. Yes.

"Q. What was the substance of those conversations? A. Well, very similar to that one, to the first one that I had, with the exception of the one that we got our hopes up about when he had the letter of agreement that has been mentioned before, * * *"

Mr. Hays, on cross examination regarding the conversation between himself, Rhodes and Conner, testified:

"A. The conversation as I recall it, was that he did not want us to hold up the job by holding up deliveries and he wanted us to go on and furnish the materials and complete the job and he would see that we were taken care of.

"Q. Yes, sir, he wanted you to get your money. A. That is what he said.

"Q. All right, let me repeat my question, maybe you did not understand it. Mr. Rhodes testified yesterday in the conversation you are referring to that Mr. Conner stated that he wanted you to get your money and he would try and help you do it, and that he would hold the money due you out of the estimates of BWC Construction Company if it was agreeable to Jack Wayte, and I am asking you if that was not the gist of the conversation? A. That is not my recollection of what was said, as far as I am concerned, if that was said I did not hear it. The thing I was interested in, of course, was in getting our money, and Mr. Conner said he would see that we got our money, and for us to go ahead and deliver the rest of the materials."

Mr. Braddock testified:

"Q. Mr. Braddock, with reference to the $1,742.75 check that Mr. Purser asked you about which he said was given on November 29, 1952, to the Belton Sand and Gravel Company? A. Yes, sir.

"Q. Now, that was after, or was it after you had said that you could no longer be responsible for bills for materials? A. Yes, sir. I did not intend to shirk all of the responsibility there, otherwise I would not have allowed it to be put in my name. I wanted the people to get their money and I

wanted them to contact the people above me and be assured of their money before I went ahead.

"Q. When was that? A. Immediately after August 15th, somewhere around there. I had failed to get a promised payment for that month and I had failed the month before to get a promised payment, and I could not catch my bills up. Mr. Conner, Mr. Wayte and I believe Mr. Rhodes were in the car with me when we went after coffee and I told them that I was going to pull out, that I was going to quit. Then Mr. Wayte and Mr. Conner asked me if I would stay if they would arrange for the materials, and I said well, I can keep this equipment and labor down here and we will just go along as best we can. After that date I was under the understanding that they were looking to them for payment.

"Q. Who was that now, Mr. Wayte and who? A. It was Mr. Wayte and Mr. Conner."

The authorities previously cited and the reasons given for sustaining the liability of Conner to the Cement Company are applicable here and are, in our opinion, sufficient to sustain his liability to Belton upon the implied finding of the Trial Court that, upon adequate evidence, he made himself primarily liable for the materials advanced by Belton for use in the construction of Walker Village.

The only other points present the contention that Wells-Grinnan M.A.B. is not liable to any appellee.

All appellees rely upon a Letter Agreement of March 17, 1953, addressed to Wells-Grinnan M.A.B. signed by W. S. Conner and approved by James L. Wells, as constituting an agreement made for their benefit and under which they are entitled, as third party beneficiaries, to recover against Wells-Grinnan M.A.B.

In addition Belton and the Morris', but not the Cement Company, reply upon estoppel.

We quote the letter:
"Law Offices of
"Owens and Purser
"Perry-Brooks Building
"Austin, Texas
"Wade Owens
"Sidney Purser    Telephone 8–9371
"March 17, 1953
"Wells-Grinnan-M.A.B.,
"1100 Main Street,
"Dallas, Texas
"Re: Military Housing Project No. 112–80002–Army 2–Ft. Hood, Texas, Driveways and Sidewalk Contract.
"Gentlemen:
"I address this letter to you to confirm our understanding of the agreements made at a conference in Dallas, Monday, March 16, 1953.
"Reference for all purposes is made to a contract dated February 19, 1952, between you as contractors and me, as the subcontractor, and a contract bond executed by the Fidelity and Casualty Insurance Company of New York (No. 2432515 dated March 1, 1952) as surety in my behalf to you as obligee.
"In consideration of the mutual promises and agreements hereinafter set out, it is agreed as follows:
"1. Paragraph No. 5 of said contract shall be amended to provide that payments may be made from the 10% of the money retained for work completed. This retained money shall be used to pay bills and statements approved by me as proper and due. Checks in payment thereof shall be made jointly to the creditor claiming to have furnished labor, materials, transportation and equipment to the construction project.

"2. Known creditors of whom I have notice are as follows:

Neeley Ready-Mix Concrete Company     10,311.48

San Antonio Cement Company     5,463.26

Belton Sand & Gravel Company, Inc.     3,484.75

Universal Atlas Cement Company     870.00

"This does not indicate approval of such bills but they shall be individually considered and proper action taken.

"3. I shall repair and replace all concrete flat-work covered by said contract which is or has been:

"a. Left unfinished contra to specifications

"b. Condemned and rejected for material defects not in compliance with specifications.

"c. Condemned and rejected for workmanship defects not in compliance with specifications.

"d. Condemned and rejected for improper installation not in compliance with specifications.

"4. You agree to maintain a reimbursement fund of $5,000.00 for operating expenses in repairing and replacing the condemned and rejected construction work stated above.

"5. From such reimbursement fund shall be paid

"A. Payrolls for labor performed on such repairs and replacement.

"B. Materials furnished for such repairs and replacement.

"C. Equipment rentals (bids will be taken for rentals of all major items)

"D. Insurance and payroll taxes

"E. Transportation for Conner alone between Austin & Killeen.

"F. Transportation (costs for) of equipment to the site.

"G. Gas, oil maintenance incidental and operating expenses.

"6. Contractor will furnish professional engineering which may be necessary to complete repairs and replacement of the rejected and condemned work.

"7. This does not in any way agree as to liability for repairs or replacement of work which it is contended was damaged by other subcontractors or contractor, and the undersigned, Conner, does not in any manner waive any rights or claims which he may have against contractor or B.W.C. Construction Company or that may be urged by B.W.C. Construction Company against Conner or the contractor.

"8. In the event the payment of approved bills and the cost of repairs and replacing condemned and rejected work exceeds the sum of the money retained and that which may be due for work not completed or rejected, the undersigned shall immediately make refund to Wells-Grinnan-M.A.B., after completion and acceptance.

"9. Checks and withdrawals from the reimbursement fund provided for in Paragraph 8 shall be countersigned by the parties to this agreement or their authorized representatives.

"10. The execution of this agreement does not in any way other than as herein set out change or effect the contract executed February 10, 1952. This is merely an understanding between contractor and sub-contractor (Conner) looking toward modification of the payment provisions of Paragraph 5 of the original contract so that funds might be more readily available for carrying on the work.

"If you agree to the provisions of this letter, will you please execute three copies—one for the surety, one for yourself and return one to me in the place designated 'Approved'.

"Yours very truly,

"/s/ W. S. Conner

"W. S. Conner

"Approved:

"/s/ James L. Wells"

Appellants make two contentions regarding this letter. They say (1) "that the reference to the payment of approved bills referred only to the approved bills for the repair and re-work and not to pay past due bills of a defaulting sub-contractor" and (2) "that even if it be assumed that the March 17th agreement referred to the claims of these appellees, certainly the agreement was not entered into for the benefit of appellees."

We cannot agree with either of these contentions.

The latter plainly states that there are "mutual promises and agreements." There are ten numbered paragraphs. Some of these provisions did relate to repairs and rework, but not all. Paragraphs 1 and 2, construed together, clearly refer to accounts previously incurred. Paragraph 8 confirms this construction by making two general classifications of bills entitled to payment out of the 10% retainage (a) approved bills (b) repairs and rework.

In paragraph 10 of the letter the purpose of the agreements is clearly stated to be "that funds might be more readily available for carrying on the work."

It is true, as the authorities cited by appellants state, that parties are presumed to contract for themselves only but it is equally true that when it clearly appears that the intention of the contracting parties was to contract for the benefit of third parties that such intention will be enforced. Standard Acc. Ins. Co. v. Knox, 144 Tex. 296, 184 S.W.2d 612.

We are of the opinion that the letter clearly evidences an agreement made for the benefit of appellees. They held legitimate claims and the record shows that the parties to the letter knew that unless claims of such nature were satisfied there would be "no carrying on the work." Wells-Grinnan M.A.B. had no authority to apply the retainage exclusively to the payment of bills for repairs and rework.

Our construction of the letter makes it unnecessary for us to consider any question of estoppel.

The judgment of the trial court is affirmed.

Affirmed.